IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

The HSC Pediatric Center
1731 Bunker Hill Road, NE
Washington, DC 20017

**Plaintiff,**

**v.**

Robert Holcomb, Jr.
5954 Rockhold Drive
Deale, Maryland 20751

Tidewater Mechanical LLC
5954 Rockhold Drive
Deale, Maryland 20751

CDS Mechanical Services, Inc.
909 William Meade Ct.
Davidsonville, MD 21035

Isadore Starobin
2102 Bromley Court
Crofton, MD 21114

**Defendants.**

Case No. 1:18-cv-01188

## COMPLAINT

Plaintiff, The HSC Pediatric Center, by counsel, as and for its Complaint against Defendants, Robert Holcomb, Jr., Tidewater Mechanical LLC, CDS Mechanical Services, Inc., and Isadore Starobin states and alleges as follows:

1.      Defendant Robert Holcomb, Jr. orchestrated multiple fraudulent schemes to steal money from The HSC Pediatric Center while he was an employee.  Defendant Holcomb conspired with CDS Mechanical Services, Inc. and an owner of CDS, Isadore Starobin, to inflate invoices submitted to HSC so that both Holcomb and CDS received kickbacks.

2.      Holcomb was entrusted to use HSC funds for the benefit of HSC.  Instead, Holcomb charged thousands of dollars of personal purchases on HSC's corporate credit card. This included new appliances which he installed in his home, gasoline for his personal use, and power tools he took for his own business, Tidewater Mechanical.

3.      Plaintiff HSC only uncovered the fraudulent activity of the Defendants after Holcomb's employment was terminated.

## THE PARTIES

4.      Plaintiff, The HSC Pediatric Center, (hereinafter "HSC"), is a pediatric specialty hospital located at 1731 Bunker Hill Road, NE, Washington, DC 20017, that provides rehabilitation and transitional care to children and young adults from infancy through 21 years of age.  HSC is part of The HSC Health System, a nonprofit health care organization committed to serving people with complex health care needs and eliminating barriers to health services. The HSC Pediatric Center serves children predominantly from DC, Maryland and Virginia who have medical complexities or life limiting illnesses with the goal of maximizing their potentials and quality of life.  A majority of these patients and families struggle not only with multiple comorbidities, but also with social determinants that make their situation even more challenging. 85-90% of HSC's reimbursement comes from Medicaid or Medicaid MCOs, most reimbursing only a percentage of HSC's costs.  For this reason, HSC's operating and capital budgets are extremely modest in order for HSC to continue providing services to this special, but underserved population.  There are numerous things HSC would like to have and provide to patients as amenities but HSC is strictly limited to only the items necessary to provide safe care.

5.      Defendant, Robert Holcomb, Jr. (hereinafter "Holcomb"), of 5954 Rockhold Drive, Deale, Maryland 20751, was employed first as the Director of Engineering and then as the Director of Facilities at HSC until his termination on February 23, 2017.

6.      Defendant, Tidewater Mechanical LLC (hereinafter "Tidewater Mechanical") is, upon information and belief, a limited liability company organized and existing under the laws of the State of Maryland, with offices located at 5954 Rockhold Drive, Deale, Maryland 20751. Holcomb is the registered agent of Tidewater Mechanical LLC.

7.      Defendant, CDS Mechanical Services, Inc. (hereinafter "CDS") is a corporation organized and existing under the laws of the State of Maryland that offers HVAC maintenance and service, centrifugal overhauls, and HVAC equipment installation services. CDS has been in business for over 15 years and is owned by Kenny Comba, Izzy Starobin, and Mark DeShayes— each of whom has over 30 years of experience in the industry.

8.      Defendant, Isadore ("Izzy") Starobin (hereinafter "Starobin"), is the Vice President of CDS and one of its owners.  Starobin was Holcomb's main point of contact at CDS. Starobin engaged in a kickback scheme with Holcomb to defraud HSC.

## JURISDICTION AND VENUE

9.      This court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists and the amount in controversy exceeds $75,000.

10.     HSC is a citizen of Washington, D.C. and Defendants Holcomb, Tidewater Mechanical, CDS, and Starobin are each citizens of Maryland.

11.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

3

12.    Venue is proper in this District because HSC is located in this District and a substantial part of the events giving rise to HSC's claims against the Defendants occurred in this District.  28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**Holcomb's Employment Background at HSC**

13.    Holcomb began working at HSC in October 2014 as the Director of Engineering. As Director of Engineering, he was supervised by former Vice President of Facilities, Robert Cook.

14.    HSC promoted Holcomb on January 1, 2016, to Director of Facilities.  The Director of Facilities position oversees engineering, transportation, and security at the hospital. Engineering includes oversight of the HVAC system, the water system, the building automation system, and any maintenance or construction done on the grounds of HSC.  Because HSC maintains a small fleet of vehicles, for employee shuttles to Metro station and to transport HSC patients to and from doctors' appointments, the Director of Facilities is also responsible for ensuring the vehicles have fuel and are maintained in working order.

15.    Over the course of almost two and a half years of employment at HSC, Holcomb's gross pay totaled over $295,000.00.

16.    The Director of Facilities is a member of the management team, and thus the individual serving in that role maintains a certain level of autonomy and is expected to carry out his or her duties without supervision.  Members of the management team, like all employees of HSC, also have fiduciary duties to HSC by which they are expected to abide at all times.

17.    HSC maintains a Disclosure of Business Conflicts of Interest Policy.  That policy provides:

4

I.     The Board of Directors, all officers, members of Management Team and employees of the Company ("Subject Persons") shall exercise their utmost good faith in all transactions touching upon their duties to the Company and its property.  In their dealings with and on behalf of the Company, they shall be held to a strict rule of honest and fair dealings between themselves and the Company. They shall not use their positions or knowledge gained there from, so that a conflict might arise between the interest of the Company and that of the individual who has a relationship with an outside organization that does business the [sic] Company or its affiliates.

II.    Subject Persons are expected to carry out their employment and fiduciary duties with diligence due care, prudence and loyalty in protecting the interests and assets of the Company and its affiliates and to fulfill their responsibilities without regard to any personal interests.

III.   Subject Persons shall not accept gifts, favors, or hospitality that might influence their decision making or actions affecting the Company that is more than a nominal value (i.e., $50.00).  Donors should be directed to the Development office so that gifts can be made to the appropriate entity.

IV.    Although it is recognized that a degree of duality of interest may exist from time to time, such duality shall not be permitted to influence adversely the decision making process of the Company.  To this end, any person subject to this policy shall promptly report the possible existence of a conflict of interest for him or herself or any other person subject to the policy to the Compliance Officer or the COO.

18.    Holcomb signed the Certification and Agreement to the Disclosure of Business

Conflicts of Interest Policy on November 10, 2014.  By signing the Certification and Agreement,

Holcomb agreed, among other things, to:

> "[T]imely disclose to the Company relevant and complete information, so that it may be included in consideration of any issue or transaction, concerning additional facts or circumstances which may result in a conflict that I become aware of after submission of this statement."

> ". . .I will not reveal to any unauthorized person any confidential information learned in the course of my duties, nor will I use my position or any such information for personal profit."

> "[R]eport to the Compliance Officer or the COO, any information I may become aware of which may be indicative of any director, officer or employee failing his or her responsibilities to the Hospital or any of its affiliated corporations because of any apparent or real conflict of interest."

19.     On November 10, 2014, Holcomb responded "No" to five questions on a

questionnaire relating to conflicts of interest:

> 1.  Do you, your immediate family, or a third party hold, directly or indirectly a position in any outside concern from which the Company or any of its affiliates receive goods or services?
>
> 2.  Do you, your immediate family, or a third party have, directly or indirectly, a financial interest in any outside concern from which the Company or any of its affiliates receives goods or services?
>
> 3.  Do you, your immediate family or a third party, compete directly or indirectly, with the Company or any of its affiliates in the purchase or sale of property or services?
>
> 4.  Do you, your immediate family or a third party, render directive, managerial or consultative services to any outside concern or person that does business with or competes with the services of Company or any of its affiliates?
>
> 5.  Have you, your immediate family or a third party accepted gifts or other favors (if more than $50) from any outside concern or person that does or is seeking to do business with or is a competitor of Company or any of its affiliates?

20.     On January 12, 2017, Holcomb completed another HSC Code of Conduct and

Conflict of Interest Attestation and Questionnaire.  Holcomb answered "No" to the questions:

> "Have you or a family member been given or offered anything worth more than $50.00 (including money, a gift, ownership, investment, and/or salary) by a business that does business or is seeking to do business with HSC?"
>
> "Are there any other personal interests or activities involving you or any family member that could appear to compromise your loyalty to HSC?"

Holcomb answered "Yes" to the questions:

> "I do not know of any unreported violations of the Code of Conduct."
>
> "I have listed all known potential conflicts of interest.  I understand that I have to update my responses to this questionnaire if a potential conflict of interest occurs in 2017."

**HSC Terminates Holcomb and Discovers Unauthorized and Fraudulent Conduct**

21.     On February 16, 2017, HSC received an employee complaint concerning Holcomb's inappropriate workplace behavior.  HSC began investigating the complaint and confirmed the employee's allegations.  Additionally, through the investigation, HSC discovered for the first time that Holcomb was engaged in a wide range of unauthorized conduct and was consistently violating the terms of his employment, including his fiduciary duties to HSC.

22.     On February 23, 2017, HSC terminated Holcomb's employment.

23.     After terminating Holcomb, HSC discovered more unauthorized conduct by Holcomb, including, as detailed below:  conspiring to develop and entering a multi-faceted kickback scheme with CDS in order to defraud HSC in excess of $88,000; causing HSC to pay more for services in order to fund the kickback scheme; using HSC's company credit card to make unauthorized purchases solely for his personal benefit and to the detriment of HSC; hiring a contractor and directing major demolition work which he was not authorized to initiate; using HSC resources to purchase materials and construct a "penthouse" for his own personal use, including directing HSC employees to expend time on his "penthouse" project instead of completing their assigned job tasks.

**The Scheme Between CDS and TMI**

24.     Holcomb owns and operates Tidewater Mechanical, LLC and/or Tidewater Mechanical, Inc.  Tidewater Mechanical claims to be in the facilities support services industry.

25.     Defendants Holcomb, Tidewater Mechanical, Starobin, and CDS engaged in a kickback scheme to funnel money from HSC to both TMI and CDS.  Defendants are aware of three mechanisms used by Holcomb, Starobin, Tidewater Mechanical, and CDS to facilitate kickbacks: a sham monthly license rental; TMI invoicing CDS for fraudulent labor; and fraudulently inflating pricing proposals for projects at HSC.

*The Sham License Rental*

26.     Tidewater Mechanical invoiced CDS a $3,296.80 monthly charge for "Inspection Services/DC/MD License Rental." The "Salesperson" on the Tidewater Mechanical invoices is "Robert Holcomb."

27.     CDS provides HVAC maintenance and service, centrifugal overhauls, and HVAC equipment installation services.   According to its website, CDS Mechanical Services, Inc. has been in business for over 15 years and all of the technicians employed by CDS are graduates of the Local Steamfitters 602 program. The owners of CDS each have over 30 years of experience in the industry.

28.     Despite employing qualified, union-trained employees and having decades of experience in the industry, CDS paid thousands of dollars a month to a one-person entity for inspection services and license rental.

29.     Tidewater Mechanical was not providing services to CDS.  Rather, CDS was funneling money from an inflated monthly inspection contract it had with HSC to Tidewater Mechanical—and thereby to HSC's Director of Facilities, Robert Holcomb.

30.     In April 2015, Holcomb convinced HSC's interim COO to enter a monthly service contract with CDS under which CDS would perform certain inspection services at HSC.

31.     HSC, at Holcomb's recommendation, entered a three-year, $62,500.00 per year contract with CDS.  The scope of work provided for weekly/monthly equipment inspections; CDS's availability to respond within two hours to an emergency; and, inspection of components of HSC's building automation system including, chillers, air compressors, HVAC, and water treatment.

32.     CDS billed HSC a $5,208.00 monthly charge for "Service Contract-For HSC Pediatric Center, HVAC Project/Service Agreement."

33.     CDS began billing HSC for the $5,208.00 monthly service charge in May 2015.

34.     Since at least May 2015, Tidewater Mechanical invoiced CDS for a monthly "Inspection Services/DC/MD License Rental" at the cost of $3,296.80 per month.

35.     Tidewater Mechanical provided no goods or services to CDS to warrant the $3,296.80 monthly payment.

36.     Holcomb never informed HSC that his business, Tidewater Mechanical, received payment from CDS.

37.     Holcomb never informed HSC that his business, Tidewater Mechanical, received payment from CDS directly related to the HSC monthly inspection contract.

38.     Any inspection-related work Holcomb would have performed for CDS was duplicative of the work Holcomb was required to perform as the HSC Director of Facilities.

*Tidewater Mechanical's Sham Labor Charges*

39.     Another facet of the kickback scheme involved Tidewater Mechanical charging CDS for "labor" on service tickets associated with work CDS billed to HSC.  However, Tidewater Mechanical provided no services to CDS in connection with CDS's service tickets at HSC.

40.     For example, CDS invoiced HSC on June 13, 2016 for $780.00 associated with six hours of labor for "Service Call-Labor as per service ticket # 18704 for service work at Hospital for Sick Children on checking out problem with AHU 2 not cooling. Replaced power head on unit." CDS supported the invoice with service ticket #18704, which notes that the repair took six hours to complete.  The CDS invoice number was 29092.

41.   On the Tidewater Mechanical invoice to CDS for the May 2016 license rental, Tidewater Mechanical also invoiced CDS $200.00 for "Labor for Invoice #29092."

42.   Tidewater Mechanical provided no labor associated with CDS invoice #29092. The CDS invoice charged HSC for six hours of labor associated with a CDS service ticket confirming the same number of labor hours worked by CDS.

43.   CDS invoiced HSC on December 2, 2015 for $2,996.00 for two hours of labor, eight hours of overtime labor, and materials relating to a service call "per service ticket #29027 for service work at Hospital for Sick Children on call for Morque [sic] pediatric container not cooling. Found compressor and condenser unit were bad. Installed new unit and charged system." The corresponding CDS service ticket, #29027, notes that CDS spent two regular hours and eight overtime hours responding to the morgue cooling issue. The CDS invoice number was 27400.

44.   On the Tidewater Mechanical invoice to CDS for the December 2015 license rental, Tidewater Mechanical also invoiced CDS $200.00 for "Labor Hours for HSC/Morgue cooler."

45.   Tidewater Mechanical provided no labor associated with CDS invoice #27400. The CDS invoice charged HSC for two hours of regular labor and eight hours of overtime labor associated with a CDS service ticket confirming the same number of labor hours worked by CDS.

46.   CDS invoiced HSC on August 9, 2016 for 38 hours of overtime labor totaling $7,220.00 associated with "Overtime Service Call-Labor as per service ticket #30425 for service work at HSC Pediatric Center on Sunday service call #2 chiller is down. Found bad actuators and

pneumatic controllers." The corresponding CDS service ticket, #30425, notes 38 hours of overtime labor. The CDS invoice number was 29737.

47.     On the Tidewater Mechanical invoice to CDS for the July 2016 license rental, Tidewater Mechanical also invoiced CDS $400.00 for "Labor for Invoice #30425 400.00 Chiller plant down."

48.     Tidewater Mechanical provided no labor associated with CDS invoice #29737. The CDS invoice charged HSC for 38 hours of overtime labor associated with a CDS service ticket confirming the same number of labor hours worked by CDS.

49.     On March 13, 2016, Kenny Comba emailed Holcomb regarding the "Cut Sheet for Computer Room Unit." Mr. Comba included specifications for a Liebert Model VS035ASA0EI143A, 10 Ton cooling system.

50.     On the Tidewater Mechanical invoice to CDS for the April 2016 license rental, Tidewater Mechanical also invoiced CDS $200.00 for "Labor Hours for 10 ton Liebert Unit, main computer unit."

*Conspiracy to Inflate Proposal Pricing*

51.     Defendants Holcomb and Starobin also marked up invoices for work CDS performed at HSC in order to provide each other with kickbacks.

52.     On March 16, 2016, Holcomb emailed Starobin regarding a proposal for HSC backflows:

> "Here is the break down for the replacement for the 5 backflows here at
> the HSC. If we run into any other cos[ts] or issues we will make up anther [sic]
> PO...
>
> Materials..$5800.00...I will furnish this..

Finamore…$2500.00

CDS…$2500.00

Tidewatermech…$2250.00

Proposal needs to say $12,800.00"

53.     The next day, on March 17, 2016, CDS presented a service proposal to HSC to "provide labor and materials to replace 5 backflow preventers at HSC" and to "provide permits and inspection fees."   The proposed price was $12,800.00.

54.     On the Tidewater Mechanical invoice to CDS for the April 2016 license rental, Tidewater Mechanical charged CDS $3,296.80 for "Inspection Services/DC/MD License Rental."  Tidewater Mechanical also invoiced CDS $5,721.13 for Material and $5,078.87 for Labor associated with "Installation of 5 Backflow Preventers, 3", 2", 3-3/4 (Contract Total, $12,800)."

55.     On August 24, 2016, Defendant Starobin emailed Defendant Holcomb regarding the replacement of a transfer switch at HSC.  Holcomb responded to Starobin:

Got it…..$5,438.00

Write it up for $6,638.00

CDS Profit: $800.00

TMI: $400

56.     CDS issued an invoice to HSC on September 2, 2016 for $6,638.00.

57.     HSC paid the CDS invoice in the amount of $6,638.00 on October 27, 2016.

58.     On January 11, 2017, Defendant Starobin emailed Defendant Holcomb regarding two Absolute Controls proposals.  Holcomb wrote back "Izzy…I['] m good with this! Please ad[d] 1500 to each proposal, and I will sign….Rob."

59.     By even the most conservative estimates, the kickback scheme between Defendants Holcomb, Tidewater Mechanical, CDS, and Starobin resulted damages to HSC in excess of $88,000.

**The "Penthouse" Project**

60.     Holcomb, without authority, used a room as an office on the uppermost floor of HSC, amongst the HVAC systems, building systems, and generators. This room was referred to as the "Penthouse" because it was on the top floor of the building.

61.     However, Holcomb abused this privilege and unbeknownst to HSC, diverted resources to turn the space into an apartment. Holcomb was not authorized to take these actions or make use of HSC funds in this manner.

62.     During HSC's post-termination investigation of Holcomb, HSC learned that Holcomb had at least one other fulltime job and possibly had part-time jobs. Holcomb's plan was to use convert the Penthouse into an apartment so that he could work his multiple jobs in Washington, D.C. and sleep in the Penthouse, thereby avoiding the need to travel to his home in Deale, Maryland.

63.     Holcomb directed HSC engineers to install a shower, a sink, a toilet, an air conditioning unit, cable hookups and carpeting in the Penthouse. Holcomb directed the HSC engineers to perform this unauthorized work instead of the work HSC employed them to perform.

64.     Holcomb hired a construction company to perform $8,965.00 worth of work on the Penthouse in his attempt to connect the newly constructed Penthouse bathroom to the water supply and waste line. Holcomb caused HSC to pay the construction company's invoice in the amount of $8,965.00 on February 29, 2016.

65.     Holcomb also hired the construction company to perform $1,298.00 worth of wall demolition and door installation in the Penthouse.  Holcomb caused HSC to pay the construction company's invoice on September 16, 2016.

**Unauthorized Credit Card Charges**

66.     Holcomb, as Director of Facilities, had access to an HSC corporate credit card.

67.     Holcomb was authorized to make purchases for HSC relating to his role as Director of Facilities using the corporate credit card.

68.     Defendant Holcomb took advantage of his position's access to the HSC corporate credit card and made personal purchases that he caused HSC to pay for.

69.     Holcomb made at least $15,000 worth of unauthorized purchases using the HSC credit card.

70.     Holcomb purchased the materials for his unauthorized Penthouse renovation using the HSC corporate credit card.  This included a bathroom vanity top and vanity cabinet totaling $406; a $275 electric water heater; a $49.00 WiFi package to equip the water heater with remote controllability; a $146.25 shower faucet; and a Delta shower enclosure and shower base totaling $483.00.  Many of these items were discovered in the Penthouse by HSC after Holcomb's termination.

71.     During his employment, some of the unauthorized purchases made by Holcomb for use at his home in Maryland and for his personal use included: a turkey fryer and 384 ounces of frying oil from Home Depot about a week prior to Thanksgiving; a household water filtration system; a mailbox post kit; a $100 Home Depot gift card seven days prior to Christmas 2015; $150 in Home Depot gift cards in the two weeks leading up to Christmas 2016; LED pond

lighting; over $250 worth of pressure treated pine decking and lumber; and thousands of dollars' worth of power tools and accessories which cannot be located on the HSC grounds.

72.     On Friday, November 25, 2016, the day after Thanksgiving, Holcomb purchased approximately $2,600 worth of appliances from H.H. Gregg.  The purchase included a kitchen's worth of Samsung black stainless steel appliances: a French door refrigerator; an electric range; a dishwasher; and an over-the-range microwave. All items were to be delivered to "Robert Holcomb, 5954 Rockhold Dr., Deale, MD."  Holcomb paid for $900.00 of this purchase with the HSC credit card he was authorized to use only for the benefit of HSC.

73.     After HSC began investigating the complaint of harassment and uncovered the unauthorized purchases, an HSC employee informed HSC that he had seen these same Samsung appliances in Holcomb's newly remodeled kitchen in Deale, Maryland on two separate occasions.  The employee explained that, once, Holcomb had asked for a ride home after work, and upon dropping Holcomb off, Holcomb invited the employee into his house and Holcomb pointed out all his new appliances.

**Unauthorized Demolition of the Volunteer and Transportation Suite**

74.     Holcomb had been instructed to execute some minor, cosmetic work in a first floor space used for the transportation Department and volunteer services.  This minor work was to consist of some new flooring, replacing the light fixtures, and painting the walls.

75.     HSC is located in an old building and thus not all areas of the building are ADA-compliant.  For this reason, HSC carefully determines whether and when to engage in full renovations because a renovation triggers a requirement to bring the renovated area into compliance with ADA requirements.  This was only one of the reasons that HSC decided to perform minor, non-renovation improvements to the transportation area.

76.     However, Holcomb ignored his instructions and exceeded his authority by hiring a non-permitted construction company, Apex Construction, to demolish the hallway and transportation office.

77.     On or around February 13, 2017, Holcomb directed Apex to rip out the ceiling in the hallway and transportation area/volunteer services, dismantle two bathrooms, and take other actions rendering the hallway and transportation area unusable.  The hallway that was demolished is used to move patients to different parts of the building and was deemed too unsafe for patients to be in.  HSC staff had to find detour routes to move patients throughout the building.

78.     Holcomb knew Apex did not have the appropriate permits to perform demolition and renovation work at HSC.

79.     Holcomb did not cause HSC to enter a contract with Apex to perform this work and Apex demolished the hallway and transportation area with no contract in place.

80.     After demolishing the hallway and transportation area, Apex generated a proposal dated February 24, 2017 for $16,800.  That proposal specified that Apex would: remove the entire ceiling; touch up walls and dove framing; remove carpet, floor, tiles, and all flooring layers; removal wall and floor tiles in two bathrooms; install new ceiling grid throughout entire space; install new wall tile in two bathrooms; and collect and dispose of any debris and trash.

81.     After Holcomb was terminated on February 23, 2017, Apex was asked to vacate the building and did not complete the work.

82.     Due to Defendant Holcomb's actions, HSC had to hire an architect to evaluate the area and determine whether ADA compliance requirements had been triggered.  The architect

determined that, given the amount of demolition done, ADA compliance was required if HSC wished to utilize the hallway and transportation area again.

83.     HSC incurred over $16,000 in expenses relating to architectural planning to fix the unauthorized demolition Defendant Holcomb directed Apex to complete.

84.     HSC received a quote of $65,656.25 to complete the construction and renovation of the hallway and transportation area that Defendant Holcomb inexplicably had demolished.

**Unauthorized Gasoline Purchases**

85.     As the Director of Facilities, Holcomb oversaw the transportation fleet maintained by HSC to transport patients.  Holcomb was authorized to use his HSC credit card to refuel the HSC vehicles.

86.     However, Holcomb abused this job duty as well.  Holcomb frequently purchased gasoline for his personal use—on weekends, holidays, and near his home.

87.     For example, on the Saturday and Sunday of Labor Day Weekend 2016, Holcomb purchased $89.31 of gasoline using his HSC credit card.  Holcomb purchased an additional $377 worth of gasoline on Saturdays or Sundays.

88.     HSC estimates that Holcomb improperly used his HSC credit card to purchase gasoline on over 30 occasions.

**Unauthorized Use and Investment in Jeep Cherokee**

89.     HSC owned a 1997 Jeep Cherokee that was falling into disrepair.  HSC designated the Jeep as "scrap," indicating that no additional funds were to be used for upkeep or repair of the Jeep.  However, HSC did authorize the engineers to continue using the Jeep to move about the HSC campus until the Jeep finally died.

90.     Rather than follow the instructions of his employer, Holcomb took the 1997 Jeep Cherokee and, using HSC funds, spent approximately $26,000 on the vehicle.

91.     Holcomb used HSC funds to tint the windows, add a suspension kit, and perform other bodywork and repairs on the Jeep.

92.     Holcomb used the Jeep as his own personal vehicle, even though the Jeep was to remain on HSC premises.

## COUNT I
### (Conspiracy to Defraud Against Defendants Holcomb, Tidewater Mechanical, CDS, and Starobin)

93.     Plaintiff restates and incorporates herein by reference Paragraphs 92, as though fully set forth here.

94.     Defendants Holcomb, Tidewater Mechanical, CDS, and Starobin participated in a conspiracy to defraud HSC of in excess of $88,000.

95.     Defendants Holcomb, Tidewater Mechanical, CDS, and Starobin formed a conspiracy in which Holcomb ensured that CDS received a monthly inspection contract from HSC; CDS would bill HSC an inflated monthly service fee; Tidewater Mechanical would "rent" its licenses to CDS under the guise of CDS's inspection contract with HSC; CDS would pay Tidewater Mechanical a portion of the CDS monthly service fee; Tidewater Mechanical would also charge CDS for labor under the guise of CDS's service work orders at HSC.

96.     The conspiracy was formed, at the latest, in April 2015 when Holcomb convinced HSC to award the monthly inspection contract to CDS.

97.     Holcomb, Tidewater Mechanical, CDS, and Starobin committed wrongful acts in furtherance of the conspiracy to defraud HSC.

98.     These wrongful acts include communicating to submit inflated pricing proposal to HSC in order to facilitate kickbacks to each other; CDS's submission of fraudulent invoices to HSC; Holcomb's approval of CDS's fraudulent invoices submitted to HSC; Tidewater Mechanical's submission of fraudulent invoices to CDS; and CDS's payment of Tidewater Mechanical's fraudulent invoices.

## COUNT II
### (Fraud)

99.     Plaintiff restates and incorporates herein by reference Paragraphs 92, as though fully set forth here.

100.    Holcomb, CDS, and Starobin falsely represented that the money HSC paid to CDS was for work actually performed by CDS at a reasonable price.

101.    That HSC's Director of Facilities was receiving kickbacks from CDS would have been a material fact to HSC when deciding to pay CDS's invoices.

102.    That Defendant Holcomb and Defendant Starobin communicated regarding the amount of extra money to charge HSC for work would have been a material fact to HSC when deciding to pay CDS's invoices.

103.    That Defendant Holcomb's company, Tidewater Mechanical, allegedly worked for CDS and billed CDS for work performed at HSC would have been a material fact to HSC when deciding to pay CDS's invoices.

104.    That HSC's Director of Facilities "rented" his company's licenses to CDS would have been a material fact to HSC when deciding to pay CDS's invoices.

105.    Defendants Holcomb, CDS, and Starobin knew the invoices CDS submitted to HSC were inflated.

106.     Defendants Holcomb, CDS, and Starobin knew the invoices CDS submitted to HSC were false.

107.     Defendants Holcomb, CDS, and Starobin intended to deceive and defraud HSC.

108.     Based on the false representations by Holcomb, CDS, and Starobin, HSC paid the CDS invoices.

109.     HSC paid CDS in excess of $88,000 based on the false representations made to HSC by CDS, Holcomb, and Starobin.

### COUNT III
### (Breach of Fiduciary Duty Against Defendant Holcomb)

110.     Plaintiff restates and incorporates herein by reference Paragraphs 92 above, as though fully set forth here.

111.     As a member of the HSC management team, Holcomb had a fiduciary obligation to Plaintiff.  This included acting in good faith toward HSC and acting loyally and in the best interest of HSC.

112.     Defendant Holcomb had a fiduciary duty to avoid self-interested transactions where his interests would compete with Plaintiff's interests.

113.     Holcomb's fiduciary duties to Plaintiff included not using his position for personal profit.

114.     Holcomb had an ongoing obligation to timely disclose to Plaintiff any information he had concerning any conflict of interest, whether real or apparent, he had which would potentially indicate that he could not put the Plaintiff's best interests first.

115.     Specifically, Holcomb had a duty to inform Plaintiff that he owned Tidewater Mechanical, an entity that received money as a result of HSC's contract with CDS.

116.    Holcomb had a duty to inform Plaintiff that he had a financial interest Tidewater Mechanical, an entity that received money as a result of HSC's contract with CDS.

117.    Holcomb had a duty to inform Plaintiff that he provided services to CDS, an entity that does business with HSC.

118.    Holcomb had a duty to inform Plaintiff that he received gifts and favors from CDS, an entity that does or seeks to do business with HSC.

119.    Holcomb breached his fiduciary duty to HSC by failing to disclose his ownership of Tidewater Mechanical.

120.    Holcomb breached his fiduciary duty to HSC by failing to disclose to HSC Tidewater Mechanical's relationship with CDS.

121.    Holcomb breached his fiduciary duty to HSC by failing to disclose to HSC that he received money and favors from CDS.

122.    Holcomb's breach of fiduciary duty and failure to disclose his relationship with Tidewater Mechanical and CDS caused HSC significant injury.

123.    Had HSC known of CDS's "subcontracting" to Tidewater Mechanical, HSC would not have entered the monthly inspection contract with CDS and would not have paid inflated prices for an unnecessary inspection contract.

124.    Had HSC known of Holcomb's relationship with Tidewater Mechanical and CDS, HSC would not have paid grossly inflated prices to CDS for service proposals.

125.    Defendant Holcomb's failure to inform HSC of his relationship with Tidewater Mechanical and CDS caused HSC to pay in excess of $88,000 for CDS invoices that were inflated or fraudulent.

126.    Holcomb breached his fiduciary duties to HSC by using HSC funds for his personal profit.

127.    Holcomb caused HSC to suffer thousands of dollars of loss based on Holcomb's unauthorized use of HSC funds for personal gain.

## COUNT IV
### (Aiding and Abetting Breach of a Fiduciary Duty Against Defendants CDS and Starobin)

128.    Plaintiff restates and incorporates herein by reference Paragraphs 92 above, as though fully set forth here.

129.    Defendants CDS and Starobin aided and abetted Defendant Holcomb's breaches of fiduciary duty.

130.    Defendant Holcomb had a fiduciary duty to his employer, HSC.

131.    Defendant Holcomb breached that fiduciary duty to HSC by conspiring with CDS and Starobin to submit inflated and fraudulent invoices to HSC, resulting in kickbacks to Holcomb.

132.    Defendants CDS and Starobin knowingly participated in and aided Defendant Holcomb's breaches of fiduciary duty.

133.    Defendants CDS and Starobin knew Holcomb was the Director of Facilities at HSC and thus knew he had fiduciary obligations to act in the best interest of HSC.

134.    Defendants CDS and Starobin assisted Holcomb in breaching his fiduciary duty to HSC by manipulating invoices and pricing proposals submitted to HSC for payment.

135.    Defendants CDS and Starobin communicated with Holcomb about increasing the price of HSC proposals in order to facilitate kickbacks to Holcomb, Tidewater Mechanical, and CDS.

<u>COUNT V</u>
**<u>(Money Had and Received/Unjust Enrichment Against Defendant Holcomb)</u>**

136.    Plaintiff restates and incorporates herein by reference Paragraphs 92 above, as though fully set forth here.

137.    HSC entrusted Defendant Holcomb with HSC funds to expend as necessary to carry out his duties as the Director of Facilities at HSC.

138.    Instead of using the funds with which he was entrusted for the benefit of HSC, Holcomb used HSC's funds for his own benefit.

139.    Holcomb retains this unjust benefit to this day because his kitchen contains appliances he purchased with HSC funds and he operates his Tidewater Mechanical business with tools he purchased with HSC funds.

140.    Holcomb's retention of the benefit is unjust.  Holcomb breached his fiduciary duty to HSC and in doing so stole thousands of dollars from HSC.

**WHEREFORE**, Plaintiff, The HSC Pediatric Center, respectfully prays that judgment be entered in its favor and against Defendants, in such amount as is proven at trial and that the Court award to Plaintiff its costs and that the Court award to Plaintiff such other and further relief as the Court deems to be just and proper.

Dated:  May 22, 2018

Respectfully submitted,

*/s/ Mark H.M. Sosnowsky*
Mark H. M. Sosnowsky
Drinker Biddle & Reath LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
Telephone: 202-354-1327
Facsimile: 202-842-8465
Email: Mark.Sosnowsky@dbr.com

***Counsel for Plaintiff,***
***HSC Pediatric Center***

23

## JURY DEMAND

Plaintiff respectfully requests a trial by jury.


Dated:  May 22, 2018                    Respectfully submitted,

                                        */s/ Mark H.M. Sosnowsky*

                                        Mark H. M. Sosnowsky
                                        Drinker Biddle & Reath LLP
                                        1500 K Street, NW
                                        Suite 1100
                                        Washington, DC 20005
                                        Telephone: 202-354-1327
                                        Facsimile: 202-842-8465
                                        Email: Mark.Sosnowsky@dbr.com


                                        **Counsel for Plaintiff,**
                                        **HSC Pediatric Center**